UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X
JAMES CARVER, as President of the NASSAU
COUNTY POLICE BENEVOLENT ASSOCIATION,
GARY LEARNED, as President of the
SUPERIOR OFFICERS ASSOCIATION OF NASSAU          MEMORANDUM
COUNTY, and THOMAS R. WILLDIGG, as               AND ORDER
President of the NASSAU COUNTY POLICE
DEPARTMENT DETECTIVES' ASSOCIATION, INC.,

                              Plaintiffs,        11-CV-1614(JS)(GRB)

              -against-

NASSAU COUNTY INTERIM FINANCE AUTHORITY,
RONALD A. STACK, LEONARD D. STEINMAN,
ROBERT A. WILD, CHRISTOPHER P. WRIGHT,
GEORGE J. MARLIN, THOMAS W. STOKES, in
Their Official capacities as directors/
members of the Nassau County Interim
Finance Authority; EDWARD MANGANO, in his
official capacity as COUNTY EXECUTIVE OF
NASSAU COUNTY; COUNTY OF NASSAU, and
GEORGE MARAGOS, in his official capacity
as NASSAU COUNTY COMPTROLLER,

                              Defendants.
----------------------------------------X
DANNY DONOHUE, as President of the Civil
Service Employees Association, Inc.,
Local 1000, AFSCMA, AFL-CIO, JERRY
LARICCHIUTA, as Local President of CSEA
Nassau County Local 830, and CIVIL SERVICE
EMPLOYEES ASSOCIATION, INC., LOCAL 1000,
AFSCME, AFL-CIO,

                              Plaintiffs,        11-CV-1900(JS)(GRB)

              -against-

NASSAU COUNTY INTERIM FINANCE AUTHORITY;
RONALD A. STACK, as Chairman and Director
of the Nassau County Interim Finance
Authority; GEORGE J. MARLIN, LEONARD D.
STEINMAN, THOMAS W. STOKES, ROBERT A. WILD
and CHRISTOPHER P. WRIGHT, as Directors

of the Nassau County Interim
Finance Authority; EDWARD MANGANO,
in his official capacity as COUNTY
EXECUTIVE OF NASSAU COUNTY; and GEORGE
MARAGOS, in his official capacity as
NASSAU COUNTY COMPTROLLER,
and COUNTY OF NASSAU,

                        Defendants.
----------------------------------------X
JOHN JARONCZYK, as President of the
Nassau County Sheriff's Correction Officers
Benevolent Association, Inc., and NASSAU
COUNTY SHERIFF'S CORRECTION OFFICERS
BENEVLOENT ASSOCIATION, INC.,

                    Plaintiffs,          11-CV-2743(JS)(GRB)

              -against-

NASSAU COUNTY INTERIM FINANCE AUTHORITY;
RONALD A. STACK, as Chairman and Director
of the Nassau County Interim Finance
Authority; GEORGE J. MARLIN, LEONARD D.
STEINMAN, THOMAS W. STOKES, ROBERT A. WILD
and CHRISTOPHER P. WRIGHT, as Directors
of the Nassau County Interim Finance
Authority; EDWARD MANGANO, in his official
capacity as COUNTY EXECUTIVE OF NASSAU
COUNTY; and GEORGE MARAGOS, in his official
capacity as NASSAU COUNTY COMPTROLLER,
and the COUNTY OF NASSAU,

                        Defendants.
----------------------------------------X
APPEARANCES
For Plaintiffs:
PBA:              Alan M. Klinger, Esq.
                  Stroock & Stroock & Lavan LLP
                  180 Maiden Lane
                  New York, New York 10038

                  Harry Greenberg, Esq.
                  Seth Greenberg, Esq.
                  Greenberg Burzichelli Greenberg PC
                  3000 Marcus Avenue, Suite 1W7
                  Lake Success, NY 11042

```
CSEA:                Aaron Kaplan, Esq.
                     Civil Service Employees Association, Inc.
                     143 Washington Avenue
                     Albany, New York 12210

COBA:                Howard G. Wirn, Esq.
                     Koehler & Isaacs, LLP
                     61 Broadway, 25th Floor
                     New York, New York 10006

Defendants:
NIFA:                Christopher J. Gunther, Esq.
                     Skadden, Arps, Slate, Meagher & Flom, LLP
                     Four Times Square
                     New York, New York 10036

Nassau County:       Marc S. Wenger, Esq.
                     Ana C. Shields, Esq.
                     Jackson Lewis P.C.
                     58 South Service Road, Suite 250
                     Melville, New York 11747
```

SEYBERT, District Judge[1]:

The Plaintiffs in these cases are several employees'
unions.[2] They commenced these cases against Nassau County Interim
Finance Authority ("NIFA") and its Directors Ronald A. Stack,

---

[1] These matters were re-assigned to the undersigned effective
April 9, 2018.

[2] The Plaintiffs in 11-CV-1614 (the "Carver" case) are the Nassau
County Police Benevolent Association ("PBA"), the Superior
Officers Association of Nassau County ("SOA"), the Nassau County
Police Department Detectives' Association, Inc. ("DAI"), and
their Presidents (collectively the "PBA Plaintiffs").  The
Plaintiffs in 11-CV-1900 (the "Donohue" case) are Civil Service
Employees' Association units and their Presidents (collectively,
the "CSEA Plaintiffs").  The Plaintiffs in 11-CV-2743 (the
"Jaronczyk" case) are the Nassau County Sheriff's Correction
Officers Benevolent Association ("COBA") and its President
(collectively, the "COBA Plaintiffs").

Leonard D. Steinman, Robert A. Wild, Christopher P. Wright, George J. Marlin, Thomas W. Stokes (collectively, the "NIFA Defendants") and Nassau County, County Executive Edward Mangano, and County Controller George Maragos (collectively, the "County Defendants") alleging that a wage freeze ordered by NIFA impaired collective bargaining agreements and/or interest arbitration awards in violation of the Contracts Clause of the United States Constitution. Currently before the Court are motions for summary judgment brought by Plaintiffs, and cross-motions for summary judgment brought by the NIFA Defendants and the County Defendants in each action. For the reasons set forth below, Plaintiffs' motions are denied, and the Defendants' cross-motions are granted.

BACKGROUND

I. Factual History

   The facts are taken from the parties' Rule 56.1 Statements and supporting documents, and are undisputed unless stated otherwise.

  A. The Parties

   The individual plaintiffs in all three cases are named in their capacities as presidents or former presidents of their respective unions. The Plaintiff unions are each recognized as the exclusive bargaining representative for that organization: the PBA represents the County's uniformed police officers; the SOA represents the superior officers of the County police departments;

the DAI represents detectives employed by the County; the CSEA represents County employees; and COBA[3] represents corrections officers and investigators at the County.

NIFA is a corporate governmental agency and instrumentality of New York State that was created in 2000 by passage of the Nassau County Interim Finance Authority Act ("NIFA Act"). The individual NIFA defendants are named in their official capacities as Directors of NIFA. Beginning January 1, 2010, Defendant Mangano was the County Executive for Nassau County, and Defendant Maragos was the County Comptroller.

B. Passage of the NIFA Act

In the face of the County's dire fiscal condition, the state legislature in June 2000 passed the NIFA Act, which was intended to assist the County to become fiscally stable and to reform its financial practices. N.Y. PUB. AUTH. LAW § 3650 et seq. Through NIFA, the State provided over $105 million in bailout funds, and NIFA issued over $2 billion in bonds for the County's benefit. In return, the County's finances are subjected to oversight until the debt is retired.

---

[3] The name of the union in the Jaronczyk case is listed as COBA for some unspecified time period and also as the Nassau County Sheriff's Officers Association ("SHOA"). The parties seem to use the COBA and SHOA labels interchangeably. The Court will use COBA to refer to these plaintiffs.

The NIFA Act established three periods of oversight: an initial interim finance period, followed by a monitoring and review period, and under certain conditions, a control period. NIFA is authorized to impose a control period at any time that enumerated events occurred or "a substantial likelihood and imminence of such occurrence" existed. N.Y. PUB. AUTH. LAW § 3669(1). One such enumerated event is that the County "shall have incurred a major operating funds deficit of one percent or more in the aggregate results of operations of such funds during its fiscal year assuming all revenues and expenditures are reported in accordance with generally accepted accounting principles." Id. NIFA terminates a control period "when it determines that none of the conditions which would permit the authority to impose a control period exist." Id. One of the authorities granted to NIFA during a control period is the power to declare a fiscal crisis and impose a wage freeze upon a finding that such a freeze "is essential to the adoption or maintenance of a county budget or a financial plan." Id.

The initial interim period of oversight ended in 2008. NIFA began monitoring and review in 2009.

C. Agreements and Interest Arbitration Awards

The Plaintiff unions have entered into various collective bargaining agreements ("CBAs") with the County throughout the years. The agreements discussed below are those relevant to the issues in this case.

6

The CSEA and the County have been parties to numerous CBAs, including one with a term of January 1, 2003 to December 31, 2007. The parties had difficulty negotiating a successor agreement and ultimately agreed to interest arbitration to resolve their issue. On December 11, 2008, the interest arbitration panel issued an award covering the period of January 1, 2008 to December 31, 2015 (the "CSEA Award"). In 2009 and 2010, the County and the CSEA entered into supplemental agreements providing for voluntary separation incentives, payroll lags, and retirement incentives.

The County's agreements with the three police unions, the PBA, DAI, and COBA, also went before interest arbitration panels. Each of these unions also agreed to re-open its contracts and extend the term in exchange for union concessions. As to the PBA, an interest arbitration panel issued an award in 2007 for the term of January 1, 2007 to December 31, 2012, which was then extended by agreement through December 31, 2015. An interest arbitration panel in 2008 issued an award regarding the County's agreement with the DAI covering the period of January 1, 2007 to December 31, 2012, which was subsequently extended through December 31, 2015. In 2009, an interest arbitration panel issued a contract for SOA covering the years 2008 through 2013, and that term was also extended through December 31, 2015 by subsequent agreement in 2009.

COBA and the County were parties to a CBA dated in March 2008 that covered the period from January 1, 2005 through December 31, 2012. A second agreement expired on December 31, 2015. Both agreements included, inter alia, wage increases, longevity payments, and increment wage increases.

D. New County Administration

Mangano, who ran for office on an anti-tax platform, became County Executive on January 1, 2010. On his first day in office, Mangano authorized the repeal of the Home Energy Fuel Tax, a tax on residential energy use. That tax produced revenue of approximately $20 million in 2010, and had projected annual revenue of $40 million in subsequent years. The County notes that the loss of revenue from the repeal may have been offset by other gains such as an increase in sales tax revenue. Also upon Mangano's inauguration, the County did not move forward with a planned cigarette tax and did not implement a scheduled property tax increase.

In September 2010, the County presented a multi-year financial plan. In September 2010, NIFA issued a Preliminary Staff Review of the Proposed Multi-Year Financial Plan Fiscal 2011-2014 for its Directors. (Donohue, Declaration of Aaron E. Kaplan ("Kaplan Decl."), Ex. 14 ("Review"), Docket Entry 65-6.) The Review expressed concerns regarding the County's proposed plan, noting that it "relies on significant State approvals, numerous

8

revenue actions, passage of ordinances by the County Legislature, extraordinary levels of unacceptable borrowing for operating expenses, and most importantly labor concessions that have not been secured. Each of these factors must be viewed as having a high degree of risk." (Id., Overview at 1.) The Review, noting that the County Legislature was still deliberating and labor negotiations continued, ultimately recommended that the Directors postpone commenting on the proposed budget until more conclusive information was available. (Id., Conclusion at 8.)

NIFA also established two changes to how it analyzed the County's fiscal health. Prior to September 2010, NIFA had allowed the County to use budgetary accounting procedures that were not in accordance with Generally Accepted Accounting Procedure ("GAAP"). In September 2010, NIFA changed to the GAAP method with the result that some revenues were reclassified to not count as revenues, leading to an increase in budget deficits. The County maintained that this created a "paper deficit" and that its traditional budget making process was acceptable. Furthermore, NIFA had also previously permitted the County to borrow money to pay property tax certiorari judgments to residents. In 2010, NIFA prohibited this practice, resulting in an increase to the deficit.

On October 30, 2010, the County Legislature passed the FY 2011 budget including items previously found to be at risk by NIFA. Documents submitted show that during the fall of 2010 until

9

January 2011, exchanges took place between the County and NIFA regarding the latter's concerns about the FY 2011 budget and the possibility that the County faced a one-percent deficit in major operating funds.  The County and NIFA discussed refinancing and restructuring the County's debt, but no action was taken.  At a NIFA meeting on December 30, 2010, NIFA allowed the County an additional month to submit materials to it addressing the deficit. Over the next month, the County provided information, and the CSEA agreed to a restructured salary schedule and other cost-savings measures.

    E.  <u>NIFA's Declaration of a Control Period</u>

On January 26, 2011, NIFA issued Resolution No. 11 entitled "Declaration of a Control Period upon Finding Likelihood and Imminence of a Deficit of More Than One Percent in the County's Fiscal Year 2011 Budget." (Kaplan Decl., Ex. 36.)  In the attached Determination, NIFA expressly stated that it was invoking its statutory authority to impose a control period "upon its determination at any time . . . that there exists a substantial likelihood and imminence of . . . a major operating funds deficit of one percent or more in the aggregate results of operations of such funds during its fiscal year . . . ."  (<u>Id.</u>, Determination at 5 (quoting N.Y. PUBL. AUTH. LAW § 3669(1)).)  Resolution No. 11 directed the County to submit a new plan for FY 2011 by

February 15, 2011. NIFA did not declare a fiscal emergency at this time.

On January 31, 2011, the County commenced a proceeding in New York State Supreme Court challenging NIFA's decision to impose a control period, arguing that NIFA lacked the authority to make that decision and alternatively, that the decision was inappropriate and unwarranted. On March 11, 2011, the state court denied the County's motion for a preliminary injunction, finding that NIFA had the authority to declare a control period. Cty. of Nassau v. NIFA, 33 Misc. 3d 227, 920 N.Y.S.2d 873 (Sup. Ct. 2011). The County's claim that NIFA's decision was arbitrary and capricious was not decided, and the court converted NIFA's motion to dismiss that claim to a motion for summary judgment and set a briefing schedule.

Soon after the decision denying a preliminary injunction was issued, the County asked NIFA to exercise its statutory authority to impose a wage freeze with respect to County employees, including the Union member Plaintiffs. On March 22, 2011, Mangano sent NIFA a revised plan for FY 2011 which also included the request for a wage freeze. On March 24, 2011, NIFA found that the revised plan did not present a balanced budget. Among other decisions, NIFA determined that a wage freeze was essential to the County's adoption and maintenance of a budget for FY 2011. (NIFA Resolution No. 11-303, Kaplan Decl. Ex. 39.) NIFA went on to

declare a fiscal crisis in the County and impose a wage freeze. (NIFA Resolution No. 11-304, Kaplan Decl. Ex. 39.) Resolution 11-304 ordered that "all increases in salary or wages of employees of the County, which will take effect after the date of this order pursuant to collective bargaining agreements, other analogous contracts, or interest arbitration awards, now in existence or hereafter entered into, requiring such salary increases as of any date thereafter are suspended." (Id.) It further suspended increased payments for holiday and vacation differentials, shift differentials, and step-ups. The duration of the wage freeze was for one year.[4]

On March 29, 2011, the County announced it was abandoning its state court proceeding against NIFA. The Plaintiffs commenced these actions shortly thereafter, arguing that there were other options, including raising taxes and cost-savings measures, that were available to the County and that defendants should have pursued those other options before implementing a wage freeze against the unionized workers.

II. Procedural History

The Carver case was filed on April 1, 2011, and the Donohue and Jaronczyk cases followed on April 18, 2011 and June 7,

---

[4] On March 22, 2012, NIFA determined that the fiscal crisis still existed and continued the wage freeze for another year.

2011, respectively.  Plaintiffs in all three cases asserted a claim

under the contracts clause of the United States Constitution.  In

addition, Plaintiffs in <u>Donohue</u> and <u>Jaronczyk</u> asserted a due

process claim arising when their property rights were affected

without notice or an opportunity to be heard in violation of the

Fifth and Fourteenth Amendments to the U.S. Constitution.  The

<u>Donohue</u> and <u>Jaronczyk</u> complaints also included state law claims of

violations of New York Public Authorities Law § 3669(3)(b) and of

Article 5, § 7 of the New York State Constitution.[5]

The cases as originally commenced also contained a claim

that NIFA's authority to impose a wage freeze was limited to the

interim finance period.  By Memorandum and Order dated February

14, 2013, District Judge Leonard D. Wexler granted summary judgment

for Plaintiffs in the <u>Carver</u> action on the lone ground that NIFA's

imposition of the wage freeze exceeded its authority under the

NIFA Act.  <u>Carver v. NIFA</u>, 923 F. Supp. 2d 423 (E.D.N.Y. 2013).

The federal contracts clause claim was not addressed.  The <u>Donohue</u>

and <u>Jaronczyk</u> cases and motion practice were held in abeyance

pending a decision on the appeal of the <u>Carver</u> decision.

On appeal, the Second Circuit vacated Judge Wexler's

decision, determining that the case presented an unresolved

_____

[5] In light of the state court ruling, Plaintiffs in <u>Donohue</u> and
<u>Jaronczyk</u> requested, with defendants' consent, that their
original complaints be considered the operative pleadings.  That
request was granted.  (<u>See</u> Minute Order of Feb. 14, 2017.)

question of state law that was more properly addressed by the state court. Carver v. NIFA, 730 F.3d 150 (2d Cir. 2013). It remanded the case with directions to dismiss the state law claim, but retain jurisdiction over the federal claim. On remand, Judge Wexler stayed the federal action pending completion of state court proceedings commenced in Nassau County. See Carver, 11-CV-1614, Docket Entry 105.

All the Plaintiffs commenced actions in state court regarding NIFA's wage freeze authority. The New York State Supreme Court determined that NIFA had the statutory authority to impose the wage freezes during a control period, and the Appellate Division affirmed that determination. See Carver v. NIFA, 142 A.D.3d 1003, 1008, 38 N.Y.S.3d 197 (App. Div. 2d Dep't), leave to appeal denied, 28 N.Y.3d 911, 69 N.E.3d 1022, 47 N.Y.S. 2d 226 (2016) (Table). The state cases having concluded, the parties in all three cases requested that the federal actions be reopened and the federal constitutional claim resolved. In light of the passage of time and intervening decisions, Judge Wexler directed that the motions and cross-motions be re-briefed. Those re-filed motions are currently before the Court.

The briefing is entirely focused upon Plaintiffs' claims of violations of the contracts clause in which they argue that the wage freeze acted to impair agreements between the unions and Nassau County. The lone federal cause of action remaining in the

_Carver_ action is the contracts clause claim as it appears that the state claims were resolved in the state court action. On April 12, 2018, the Plaintiffs in _Donohue_ and _Jaronczyk_ were directed to advise the Court as to whether they intended to pursue any claims from their original complaints in addition to the contracts clause claims. Counsel in both cases have advised the Court that the sole claim remaining is the contracts clause claim, and that they do not intend to pursue any other claim. (See _Donohue_, Docket Entry 74; _Jaronczyk_, Docket Entry 88.)

## DISCUSSION

I.  Legal Standards

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); see _Anderson v. Liberty Lobby, Inc._, 477 U.S. 242, 247-48, 106 S. Ct. 2505, 106 L. Ed. 2d 202 (1986). In determining a motion for summary judgment, the court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences favor of that party, and to eschew credibility assessments." _Amnesty Am. v. Town of W. Hartford_, 361 F.3d 113, 122 (2d Cir. 2004). After the moving party has met its burden, the opposing party "'must do more than simply show that

there is some metaphysical doubt as to the material facts. . . . [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial.'" Caldarola v. Calabrese, 298 F.3d 156, 160 (2d Cir. 2002) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)).

II.  Contracts Clause Claims

The contracts clause provides, in pertinent part, that "no state shall . . . pass any . . . Law impairing the Obligation of Contracts. . ." U.S. CONST., ART. I, § 10, cl. 1. Although the language appears mandatory and absolute, courts have acknowledged that some impairment is Constitutionally-permissible. See, e.g., Condell v. Bress, 983 F.2d 415, 417 (2d Cir. 1993). The state may, in an exercise of its police power, abridge a contract when that impairment is "reasonable and necessary to serve an important public purpose." United States Trust Co. v. New Jersey, 431 U.S. 1, 25, 97 S. Ct. 1505, 52 L. Ed. 2d 92 (1977). To determine whether a law impermissibly impairs a contract, a court considers whether the impairment is substantial, whether the law serves a legitimate public purpose, and if so, "are the means chosen to accomplish this purpose reasonable and necessary." Buffalo Teachers Fed'n v. Tobe, 464 F.3d 362, 368 (2d Cir. 2006).

It is clear, however, that the contracts clause "prohibits the impairment by the state of existing contracts" but

does not apply to contracts created after the allegedly-offensive law was enacted. Fabri v. United Techs. Int'l, Inc., 387 F.3d 109, 124 (2d Cir. 2004) (emphasis in original); see also Kinney v. Conn. Judicial Dep't, 974 F.2d 313, 315 (2d Cir. 1992) ("of course, the offending statute necessarily must be enacted after the contract in question has come into effect"). The sequence of the timing of the union contracts and the legislation raises a threshold question in this case. The NIFA Act was passed by the state legislature in June 2000, the agreements and/or interest arbitration awards affected by the wage freeze were entered into on various dates between 2007 and 2010, and NIFA declared a fiscal crisis and imposed a wage freeze on March 24, 2011. Defendants argue that the relevant offending statute was the NIFA Act and thus there is no contracts claim as to the subsequent agreements; Plaintiffs argue that the wage freeze decision was the "law" and that the impaired agreements were entered into prior to that ruling. The Court must first determine whether the legislative act from which Plaintiffs' claims arise was the passage of the NIFA Act by the state legislature or the imposition of the wage freeze by NIFA.

A.  The NIFA Act and Formation of NIFA

In June 2000, the New York State legislature created NIFA "in response to the growing financial crisis facing Nassau County." Carver, 730 F.3d 150, 152 (2d Cir. 2013); see NIFA Act,

17

N.Y. Pᴜʙ. Aᴜᴛʜ. Lᴀᴡ § 3650 et seq. NIFA was created as a "corporate governmental agency and instrumentality of the state constituting a public benefit corporation." N.Y. Pᴜʙ. Aᴜᴛʜ. Lᴀᴡ § 3652 (1). A public benefit corporation "is a corporation organized to construct or operate a public improvement wholly or partly within the state, the profits from which inure to the benefit of this or other states, or to the people thereof." N.Y. Gᴇɴ. Cᴏɴsᴛʀ. Lᴀᴡ § 66. The NIFA Act indicated that "the creation of the authority and the carrying out of its corporate purposes are in all respects for the benefit of the people of the state of New York and are public purposes." N.Y. Pᴜʙ. Aᴜᴛʜ. Lᴀᴡ § 3661.

The NIFA Act authorizes NIFA to impose a "control period" in the event of various occurrences including a major operating funds deficit. N.Y. Pᴜʙ. Aᴜᴛʜ. Lᴀᴡ § 3669. During a control period, NIFA is authorized to declare a fiscal crisis, and thereafter, a wage freeze. Specifically, NIFA "shall be empowered to order that all increases in salary or wages of employees of the county and employees of covered organizations which will take effect after the date of the order pursuant to collective bargaining agreements, other analogous contracts or interest arbitration awards, now in existence or hereafter entered into, requiring such salary increases as of any date thereafter are suspended." N.Y. Pᴜʙ. Aᴜᴛʜ. Lᴀᴡ § 3669.

B. <u>Analysis of NIFA's wage freeze</u>

The contracts clause's prohibition "is aimed at the legislative power of the State, and not at the decisions of its courts, or the acts of administrative or executive boards or officers, or the doings of corporations or individuals." <u>New Orleans Water-Works Co. v. La. Sugar Refining Co.</u>, 125 U.S. 18, 30, 8 S. Ct. 741, 31 L. Ed. 2d 607 (1888). "Any enactment, such as a by-law or ordinance of a municipal corporation, to which a state gives the force of law, is a statute of the state within the meaning of the Contract Clause." <u>Montauk Bus Co. v. Utica City Sch. Dist.</u>, 30 F. Supp. 2d 313, 319 (N.D.N.Y. 1998) (citing <u>New Orleans Water-Works</u>, 125 U.S. at 31). Thus, the Court must determine whether NIFA was acting legislatively or administratively when it imposed the wage freeze.

There is nothing in the record to indicate that NIFA is itself a legislative body. <u>See</u> <u>Schulz v. Kellner</u>, No. 07-CV-0943, 2011 WL 2669456, at *9 (N.D.N.Y. July 7, 2011) (no contracts clause claim because Defendant-Commissioners of NY Board of Elections "are not legislative bodies and therefore are not proper parties in an action pursuant to the Contracts Clause"). Further, the imposition of the wage freeze does not appear to be a legislative act. NIFA did not hold hearings, promulgate a law or ordinance, or create new legal standards when it acted. <u>See generally</u> <u>Matter of Alca Indus. v. Delaney</u>, 92 N.Y.2d 775, 778,

19

709 N.E.2d 97, 686 N.Y.S.2d 356 (1999) (distinguishing decisions based on individual circumstances from creation of a rule that "implement[s] a standard or procedure that directs what action should be taken regardless of individual circumstances"). Instead, it exercised statutory authority given to it by the state legislature under the NIFA Act. Put in other words, the State exercised its authority in passing the NIFA Act, and NIFA's imposition of the wage freeze was not a separate legislative action, but only an application of previously created law. As such, NIFA's actions are administrative in nature. See, e.g., Waltz v. Bd. of Ed. of Hoosick Falls Cent. Sch. Dist., No. 12-CV-0507, 2013 WL 4811958, at *8 (N.D.N.Y. Sept. 10, 2013) (school board act approving CBA after a vote not a legislative act under the contracts clause); Chaffer v. Bd. of Ed. of City Sch. Dist., 229 F. Supp. 2d 185, 191 (E.D.N.Y. 2002) (school board's decision to terminate an employment contract not a legislative act); Jamaica Ash & Rubbish Removal Co. v. Ferguson, 85 F. Supp. 2d 174, 183-84 (E.D.N.Y. 2000) (act taken by Trade Waste Commission was "nothing more than an administrative act, carried out by a commission authorized and created by New York City law").

In declaring a fiscal crisis and imposing the wage freeze, NIFA did not create a "new rule," but merely exercised authority delegated to it by the legislature in 2000. Such an exercise does not fall within the contract clause's prohibition.

See _Tocci Bros., Inc. v. City of N.Y._, No. 00-CV-0206, 2000 WL 1134367, at *9 (E.D.N.Y. Aug. 3, 2000) (administrative acts taken pursuant to legislative authority do not implicate the contracts clause or else "every administrative action would become subject to the Contracts Clause, a result clearly prohibited by controlling precedent."); W. 95 Hous. Corp. v. N.Y. City Dep't of Hous. Pres. & Dev., No. 01-CV-1345, 2001 WL 664628, at *8 (S.D.N.Y. June 12, 2001), _aff'd_, 31 F. App'x 19 (2d Cir. 2002) (City agency's interpretation of regulations was not an act of legislation and thus could not form the basis of a contract clause claim); Jamaica Ash, 85 F. Supp. 2d at 183 (granting of license by a commission bore "none of the hallmarks of a legislative act; it was an application of the law, not the creation of a law"). The NIFA Act itself acknowledges that the state legislature was conferring NIFA with specific powers by stating that NIFA would perform "an essential governmental function in the exercise of the powers conferred upon it by this title," not the creation of such powers. N.Y. PUB. AUTH. LAW § 3661 (emphasis supplied). The wage freeze authority is one of those powers expressly granted by the state. See also Carver, 142 A.D.3d at 1008 ("the legislature clearly and unequivocally conferred wage freeze authority upon NIFA during control periods").

The Buffalo Teachers case addressed a similar situation regarding the actions of a state-created fiscal board. There,

the state legislature, to address a severe fiscal crisis in the city of Buffalo, passed the Buffalo Fiscal Stability Authority Act (the "BFSA Act"), which created the Buffalo Fiscal Authority ("BFA") and gave it various authority including, inter alia, the power to impose a wage and/or hiring freeze. Buffalo Teachers, 464 F.3d at 366. Within months of its establishment, the BFA imposed a wage freeze. Unlike the cases currently before this Court, however, the BFA's wage freeze impacted union contracts that had been negotiated and executed before the state legislature had passed the legislation that created the BFA. As the contracts at issue existed before both the BFSA Act and the wage freeze by the BFA, the Second Circuit was not called upon to directly address whether the BFA's wage freeze was a separate legislative act. In dicta, however, the Second Circuit clearly treated the BFSA Act as the legislation that impaired the pre-existing contracts--"[t]he New York legislature had a legitimate public purpose in passing the [BFSA] Act and its wage freeze power." Id. at 368. Another court addressing the BFA's actions was more direct about the administrative nature of that board's acts. See Foley v. Masiello, 38 A.D.3d 1201, 833 N.Y.S.2d 342 (4th Dep't 2007). Although the basis of the motion in that case was application of the appropriate statute of limitations, the court clearly stated that the BFA's "action in imposing the wage freeze was administrative rather than legislative given its individualized application, limited

duration, and informal adoption, i.e., resolution by the governing body." Id. at 1202 (internal quotation and citations omitted).

NIFA was exercising authority granted to it by the state legislature. This exercise was administrative, not legislative, and thus cannot form the basis of a contracts clause claim. As the NIFA Act, the enabling statute, was passed into law prior to the affected union contracts, there can be no contracts claim on that basis either.[6] Accordingly, defendants' motions for summary judgment are granted, and all Plaintiffs' cross-motions are denied.

CONCLUSION

The cases and pending motions are resolved as follows:

- 11-CV-1614 Carver action: Plaintiffs' motion, Docket Entry 116, is DENIED; Defendants' cross-motions, Docket Entries 114 and 115, are GRANTED.

- 11-CV-1900 Donohue action: Plaintiffs' motion, Docket Entry 65, is DENIED; Defendants' cross-motions, Docket Entries 66 and 69, are GRANTED.

---

[6] Plaintiffs argue that a ruling that the contracts clause does not apply would leave them without a remedy. The wage freeze power was expressly authorized by NIFA Act. Plaintiffs could have commenced an Article 78 proceeding in state court to determine whether the exercise of that authority by NIFA in 2011 was reasonable. As Plaintiffs do not apparently challenge the constitutionality of the NIFA Act but rather only its application to its members, they had the option to challenge the wage freeze in an article 78 proceeding, which "is generally the proper vehicle to determine whether a statute, ordinance, or regulation has been applied in an unconstitutional manner." Kovarsky v. Hous. & Dev. Admin. of City of N.Y., 31 N.Y.2d 184, 191, 286 N.E. 2d 882, 335 N.Y.S.2d 383 (1972).

- 11-CV-2743 <u>Jaronczyk</u> action: Plaintiffs' motion, Docket Entry 75, is DENIED; Defendants' cross-motions, Docket Entries 79 and 80, are GRANTED.

In each case, the Clerk of the Court is directed to enter judgment in favor of Defendants and against Plaintiffs and to mark the case closed.

SO ORDERED

<u>/s/ JOANNA SEYBERT</u>
JOANNA SEYBERT, U.S.D.J.

Dated:    April __26__, 2018
          Central Islip, New York